1

2

3

4                    UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6                         SAN FRANCISCO DIVISION

7

8    UNITED STATES OF AMERICA,              Case No. 24-cr-00513-PHK-1

9              Plaintiff,
                                            **ORDER DENYING DEFENDANT'S**
10         v.                               **MOTIONS TO SUPPRESS AND**
                                            **MOTION FOR A JURY TRIAL**
11   PATRICIA DZIB CAMAS,
                                            Re: Dkts. 16, 18, 20
12            Defendant.

13

14         Patricia Dzib Camas ("Defendant") is charged with two Class B misdemeanors: (1) driving

15   under the influence of alcohol, in violation of 36 C.F.R. § 4.23(a)(1); and (2) operating a motor

16   vehicle with a blood alcohol content ("BAC") of .08 percent or greater, in violation of 36 C.F.R.

17   § 4.23(a)(2).  Defendant has filed two separate motions to suppress and a motion for a jury trial.

18   [Dkt. 16; Dkt. 18; Dkt. 20].  The Government has filed oppositions to the motions, and Defendant

19   has replied.  *See* Dkts. 24-29.  The Court heard oral argument from the Parties' counsel on April

20   10, 2025.  *See* Dkt. 30.  Upon careful review of the materials and arguments submitted by the

21   Parties and as discussed herein, the Court **DENIES** each of these motions.

22                              **BACKGROUND**

23         The arresting officer, Ranger Michael Pearson of the National Park Service, filed an

24   incident report for this case relating to Defendant's arrest leading to this matter.  *See* Dkt. 17-1.

25   The Court has also received and reviewed footage from Ranger Pearson's body-worn camera from

26   the date and time of the arrest.  *See* Dkt. 17-2.

27         On May 22, 2024, Ranger Pearson was on duty in San Francisco's Golden Gate National

28   Recreation Area.  [Dkt. 17-1 at 7].  Around 7:32 a.m., Ranger Pearson was stationed inside his

*United States District Court*
*Northern District of California*

fully marked patrol vehicle at the 3200 block of Van Ness Avenue facing north, when he observed a silver Honda Accord travelling southbound towards North Point Street. *Id.* Ranger Pearson saw the vehicle drive past him at a high rate of speed. *Id.* He also saw that the car had an expired registration sticker. *Id.* Inside the vehicle, he could see a female in the driver seat and a male passenger in the rear passenger compartment of the vehicle. *Id.*

As the vehicle passed by, Ranger Pearson immediately turned to follow it. *Id.* Ranger Pearson witnessed the vehicle fail to stop at a posted stop sign. *Id.* As the vehicle turned left at the intersection onto North Point Street, Ranger Pearson heard the vehicle's tires "chirping" from excessive speed. *Id.* At that time, Ranger Pearson activated his emergency lights and sirens to effectuate a traffic stop. *Id.* The vehicle continued travelling eastward towards the intersection of North Point Street and Polk Street. *Id.* As the vehicle began to make a righthand turn to head south onto Polk Street, Ranger Pearson saw the vehicle nearly strike a bicyclist in the process of crossing Polk Street using the crosswalk. *Id.* The vehicle briefly stopped to let the bicyclist cross and then continued south onto Polk Street with Ranger Pearson remaining in pursuit. *Id.* The vehicle eventually stopped at the intersection of Polk Street and Bay Street, at which time Ranger Pearson exited his patrol car, activated his body-worn camera, and verbally commanded Defendant to remain inside the vehicle. *Id.*

Ranger Pearson approached the open front passenger window of the vehicle from the rear. *Id.* The driver, later identified as Defendant, immediately handed Ranger Pearson her driver's license. *Id.* Ranger Pearson asked Defendant why she had taken off, and Defendant said she needed to get home. [Dkt. 17-2 at 1:01-9]. Ranger Pearson then asked for Defendant's registration and proof of insurance. [Dkt. 17-1 at 7]. Defendant told Ranger Pearson that her registration and insurance were both at her house. *Id.*

Ranger Pearson asked Defendant if she could roll down the rear passenger side window, and Defendant verbally consented, proceeding to electrically roll down that window. [Dkt. 17-2 at 1:25-28]. Ranger Pearson asked the male passenger, who was sitting in the rear passenger seat, if he had identification on him. *Id.* at 1:28-33. The passenger then conversed with Defendant, who handed the passenger a backpack and his passport, which were both in the front seat of the vehicle.

*Id.* at 1:33-47.  The passenger handed his passport to Ranger Pearson.  *Id.* at 1:47-50.  Ranger Pearson inspected the passport and then asked the passenger, "Have you ever had a California ID?"  *Id.* at 1:50-52.  Defendant, answering on behalf of the passenger, stated that the passenger did not.  *Id.* at 1:52-56.

Ranger Pearson then asked Defendant, "So what were you guys doing down there?"  *Id.* at 1:56-58.  Defendant answered that she and the passenger were "just hanging out."  *Id.* at 1:58-2:02.  Ranger Pearson asked Defendant what time they first arrived, and Defendant answered that they had been there since two in the morning.  *Id.* at 2:02-11.  Ranger Pearson again asked Defendant what she and her passenger had been doing in the immediate vicinity.  *Id.* at 2:11-2:16.  Defendant again said that they were "just hanging out."  *Id.* at 2:15-20.  Ranger Pearson was interrupted by a radio call briefly.  *Id.* at 2:20-2:53.  He then asked Defendant, "So you guys are just hanging out since two in the morning talking, have you had anything to drink?  Anything to smoke?  No drugs or alcohol in the car?"  *Id.* at 2:53-3:02.  Defendant responded "no" to each of these questions.  *Id.*  Ranger Pearson then asked if there were any weapons, such as knives or guns, in the vehicle.  *Id.* at 3:02-05.  Defendant responded in the negative.  *Id.*

In the bodycam footage, the male passenger can be seen with visibly droopy eyelids.  Ranger Pearson asked the male passenger, "You alright man?"  *Id.* at 3:06-13.  The male passenger, in response, appears to nod his head slightly, though he did not respond verbally.  *Id.*  Ranger Pearson, who at this point in the bodycam footage was positioned next to the open front passenger window, then asked Defendant if the passenger had anything to drink or smoke.  *Id.* at 3:13-19.  Defendant responded in the negative.  *Id.*  Ranger Pearson then asked Defendant again if she "was absolutely sure," telling her that he "could smell alcohol."  *Id.* at 3:19-21.

In the bodycam footage, Defendant and the passenger can be seen and heard conversing in low tones of voice that are not picked up clearly by the audio recording.  *Id.* at 3:21-26.  Defendant then tells Ranger Pearson that the passenger does not speak English, and Ranger Pearson indicates that Defendant understands the passenger which she confirms.  *Id.* at 3:26-35.  Ranger Pearson then asked Defendant, "So if [the passenger] hasn't had anything to drink, then have you had anything to drink?"  *Id.* at 3:35-40.  Defendant again responded, "no."  *Id.*  Ranger Pearson asked

1  Defendant if she was "sure," and Defendant again denied having anything to drink. *Id.* at 3:40-42.

2       As Ranger Pearson spoke with Defendant, he observed that her eyes appeared watery and

3  that her speech sounded slurred. [Dkt. 17-1 at 7]. Ranger Pearson reported that he could also

4  smell the odor of intoxicants emanating from inside the vehicle. *Id.* Ranger Pearson observed that

5  the male passenger, who was still seated in the rear passenger compartment of the vehicle,

6  appeared to be under the influence of alcohol. *Id.*

7       After a check of Defendant's license status came back through dispatch as valid, Ranger

8  Pearson asked Defendant to step outside of the vehicle. *Id.* Ranger Pearson told Defendant that

9  he would perform an eye test to make sure she was good to drive. [Dkt. 17-1 at 6:58-7:04].

10  Defendant responded that this was fine, and in the bodycam footage her speech was audibly

11  slurred at this point. *Id.* at 7:04-10. Ranger Pearson asked Defendant if she had any medical

12  conditions, and she denied having any. *Id.* at 7:18-21.

13       With Defendant's consent, Ranger Pearson conducted a Horizontal Gaze Nystagamus field

14  sobriety test. [Dkt. 17-1 at 8]. The bodycam footage shows that Defendant had difficulty

15  following the instructions to follow the tip of Ranger Pearson's finger with her eyes and without

16  turning her head—at one point, she grasps both sides of her head to try to hold it still, and at

17  another point, she giggles at her inability to keep her head still. [Dkt. 17-2 at 7:22-8:10].

18  Defendant failed to keep her head still at least three times during this test, even after Ranger

19  Pearson repeated the instructions for the test that she follow his fingertip with her eyes only. Per

20  the incident report, Ranger Pearson observed that Defendant had difficulty balancing and was

21  visibly swaying as she spoke. [Dkt. 17-1 at 8]. The bodycam footage shows that Defendant was

22  swaying during the eye test. [Dkt. 17-2 at 7:22-8:10].

23       After the eye test, Ranger Pearson asked Defendant about a visible mark on her neck. *Id.*

24  at 9:49-10:04. Defendant explained that how she got the mark, denied any recent physical

25  injuries, and denied that she was in any danger. *Id.* In the bodycam footage, Defendant's speech

26  is audibly slurred during portions of this conversation. Ranger Pearson asked Defendant again

27  about the source of the alcohol smell in the vehicle. *Id.* at 12:15-44. Defendant, in response, told

28  Ranger Pearson that the male passenger had, in fact, consumed two alcoholic drinks, contradicting

United States District Court
Northern District of California

4

1  her previous statement to the officer.  *Id.*

2      At this point, Ranger Simon of the National Park Service arrived on the scene.  [Dkt. 17-1

3  at 10-11].  Ranger Pearson explained the situation to Ranger Simon, including his initial

4  observations of Defendant's driving through the stop sign and nearly hitting the bicyclist.  [Dkt.

5  17-2 at 13:33-13:50].  Ranger Pearson informed Ranger Simon that he performed the eye test and

6  got indicators.  *Id.* at 13:50-54.  He also informed Ranger Simon that the passenger in the car

7  appeared intoxicated.  *Id.* at 14:00-05.

8      With Defendant's further consent, Ranger Pearson conducted two additional field sobriety

9  tests.  [Dkt. 17-1 at 8-9].  Before administering the Walk and Turn test, Ranger Pearson asked

10  Defendant if there was any reason that she would not be able to complete the test.  *Id.* at 8.  Per the

11  bodycam footage, Defendant informed Ranger Pearson prior to starting the test that her feet were

12  "kind of sloppy" and "not straight."  [Dkt. 17-2 at 15:00-13].  Defendant then started the test

13  unprompted multiple times while Ranger Pearson was still trying to explain the directions.  [Dkt.

14  17-1 at 8].  Defendant stated that she was nervous and laughed.  [Dkt. 17-2 at 15:34-40].  Ranger

15  Pearson explained to Defendant that she should take nine steps and turn around and take a further

16  nine heel-to-toe steps.  *Id.* at 16:20-17:05.  He repeated these directions at least five times.  *Id.*

17  During the Walk and Turn test, however, Defendant took ten steps.  *Id.* at 17:38-18:01.

18      As Ranger Pearson gave Defendant instructions for the One Leg Stand test, Defendant

19  referred again to her leg and stated that she was out of shape.  *Id.* at 18:05-20.  She again stated

20  that she was nervous and again laughed.  *Id.* at 19:06-11.  During almost the entirety of the One

21  Leg Stand test, Defendant can be observed visibly swaying, putting one leg down as she loses

22  balance, and swinging her arms away from her sides.  *Id.* at 19:11-48.  Defendant also had

23  difficulty counting numbers out loud as directed.  *Id.*

24      Ranger Pearson reported that Defendant failed all three field sobriety tests.  [Dkt. 17-1 at

25  8-9].  Defendant refused to submit to a preliminary alcohol screening test.  *Id.* at 9.  Ranger

26  Pearson then placed Defendant under arrest for suspicion of driving under the influence.  *Id.*

27      Ranger Simon's supplemental incident report set forth his interactions with the passenger,

28  who remained in the parked car while the field sobriety tests were administered.  *See id.* at 10-12.

United States District Court
Northern District of California

1  The passenger, using a telephonic Spanish interpreter, admitted to Ranger Simon that he had had a

2  few beers to drink.  *Id.* at 11.  From outside the vehicle, Ranger Simon observed an open and

3  partially collapsed Smirnoff Ice can on the front passenger floorboard.  *Id.*  He informed Ranger

4  Pearson, who then performed a search of the vehicle, finding a second open container of alcohol in

5  the passenger seatback pocket.  *Id.* at 9, 11.  Field screening tests confirmed the presence of

6  alcohol in both containers.  *Id.*

7       Upon arrival at United States Park Police headquarters in San Francisco, Defendant

8  consented to a chemical breath test.  *Id.* at 10.  The initial breath test, administered at

9  approximately 9:13 a.m., resulted in a BAC of .13.  *Id.* at 10.  A second breath test, administered

10  at approximately 9:20 a.m., yielded the same results.  *Id.*  Defendant was then charged with (1)

11  driving under the influence of alcohol, 36 C.F.R. § 4.23(a)(1); and (2) driving under the influence

12  of alcohol with a BAC of 0.08 percent or greater, 36 C.F.R. § 4.23(a)(2).

13       At her initial appearance on October 8, 2024, Defendant entered a not guilty plea as to both

14  charges against her.  [Dkt. 3].  On March 13, 2025, Defendant filed the instant motions: (1) a

15  motion for a jury trial [Dkt. 20]; (2) a motion to suppress based on a lack of probable cause to

16  arrest [Dkt. 16]; and (3) a motion to suppress based on an impermissible extension of the initial

17  traffic stop and an unconstitutional search [Dkt. 18].

18                              **ANALYSIS**

19  **I.     MOTION FOR A JURY TRIAL**

20       As noted, Defendant is charged with two Class B misdemeanors, 36 C.F.R. § 4.23(a)(1)

21  and 36 C.F.R. § 4.23(a)(2).  Each of these charges carries a maximum penalty of up to six months'

22  imprisonment.  36 C.F.R. § 1.3.

23       Defendant moves for a jury trial with respect to the two charges against her, arguing that

24  she is entitled to have her case tried by a jury "under the explicit terms of the Constitution."  [Dkt.

25  20 at 7].  The Government contends that Defendant is not entitled to a jury trial in this

26  misdemeanor case.  [Dkt. 26 at 2].

27       The Sixth Amendment guarantees that "[i]n *all* criminal prosecutions, the accused shall

28  enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein

United States District Court
Northern District of California

the crime shall have been committed[.]" U.S. Const. amend. VI (emphasis added).  However, as

Defendant herself concedes, the United States Supreme Court has long held "that the Sixth

Amendment, like the common law, reserves this jury trial right for prosecutions of serious

offenses, and that 'there is a category of petty crimes or offenses which is not subject to the Sixth

Amendment jury trial provision.'" *Lewis v. United States*, 518 U.S. 322, 325 (1996) (quoting

*Duncan v. Louisiana*, 391 U.S. 145, 159 (1968)).

In determining whether a particular offense should be deemed "petty," courts consider

"objective indications of the seriousness with which society regards the offense." *United States v.*

*Ehmer*, 87 F.4th 1073, 1108 (9th Cir. 2023) (quoting *Blanton v. City of N. Las Vegas*, 489 U.S.

538, 541 (1989)).  Specifically, "courts look to the maximum penalty that could result from a

conviction." *United States v. Stanfill El*, 714 F.3d 1150, 1152 (9th Cir. 2013) (citing *Lewis*, 518

U.S. at 326).  A defendant is entitled to a jury trial "where imprisonment for more than six months

is authorized." *Baldwin v. New York*, 399 U.S. 66, 69 (1970).  "An offense carrying a maximum

prison term of six months or less is presumed petty, unless the legislature has authorized

additional statutory penalties so severe as to indicate that the legislature considered the offense

serious." *United States v. Wallen*, 874 F.3d 620, 625 (9th Cir. 2017) (quoting *Lewis*, 518 U.S. at

326).

In this case, the two offenses charged—36 C.F.R. § 4.23(a)(1) and 36 C.F.R.

§ 4.23(a)(2)—are both Class B misdemeanors, each of which carries a maximum term of

imprisonment of six months.  The controlling case law makes clear that these are presumptively

petty offenses. *United States v. Nachtigal*, 507 U.S. 1, 4 (1993) (per curium) ("Because the

maximum term of imprisonment is six months, DUI under [36 C.F.R. § 4.23] is presumptively a

petty offense to which no jury trial right attaches."); *accord Blanton*, 489 U.S. at 541-42; *see also*

*United States v. Ballek*, 170 F.3d 871, 876 (9th Cir. 1999) ("Where the maximum term of

imprisonment is six months or less, there is a very strong presumption that the offense is petty and

defendant is not entitled to a jury trial.").  Any argument that the additional penalties associated

with these two offenses are so severe as to transform the offenses into "serious" ones for purposes

of the Sixth Amendment jury trial right is foreclosed by *Nachtigal*, which explicitly held that there

is no right to a jury trial for alleged violations of 36 C.F.R. § 4.23.  507 U.S. at 5-6.

Accordingly, because the offenses with which Defendant is charged are "petty," Defendant is not entitled to a jury trial under the Sixth Amendment.  The fact that Defendant is charged with two counts and thus faces an aggregate potential prison term of more than six months is, as Defendant herself conceded at the hearing, irrelevant.  *See Lewis*, 518 U.S. at 330 ("Where the offenses charged are petty, and the deprivation of liberty exceeds six months only as a result of the aggregation of charges, the jury trial right does not apply.").

Defendant urges the Court to "reject" application of this controlling legal precedent, arguing that "[w]hile the Supreme Court over the last century has crafted a so-called 'petty offense doctrine[,]' . . . [t]his Court has the authority to, and should, reject the 'petty offense' doctrine as applied to federal crimes, and enforce the plain text of the Constitution to grant Ms. Camas a trial."  [Dkt. 20 at 6].  The Court is in no position to "reject" binding law.  *See Hutto v. Davis*, 454 U.S. 370, 375 (1982) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of [the Supreme] Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be."); *see also Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 798 (2014) (adherence to precedent is "a foundation stone of the rule of law.").

Defendant admits that one motivation for filing this motion is the fact that there is apparently a petition for certiorari pending before the Supreme Court on the issue of whether a defendant charged with a petty offense should be entitled to a jury trial.  Defendant claims that no Supreme Court litigant has ever expressly argued for complete abolishment of the petty offense doctrine, in light of the literal text of the Sixth Amendment.  [Dkt. 20 at 9].  However, at the hearing, Defendant's counsel conceded that she had not examined all briefing submitted to the Supreme Court in previous cases involving the petty offense doctrine, and she further admitted that, if there was prior briefing urging abolition of the petty offense doctrine as unconstitutional, Defendant's current argument would be weakened, if not undermined entirely.  Indeed, this Court has found at least one prior brief to the Supreme Court arguing for eradication of the petty offense doctrine as contrary to the literal text of the Sixth Amendment alone.  *See* Brief of Amicus Curiae,

*Lewis v. United States*, No. 95-6465, 1996 WL 86582, a *12 (Feb. 29, 1996) ("Amicus curiae would urge this Court to re-examine the petty offense exception. . . . Rather than viewing jury trial as an impediment to the smooth functioning of justice, amicus curiae urges this Court to restore the jury to its proper function as the pre-eminent guarantor of due process in the American judicial system for "all crimes" and "in all criminal prosecutions.").  In *Lewis*, the Supreme Court did not reexamine the petty offense exception and did not abolish the doctrine, even though there was an express request that the Court do so in light of the express language of the Sixth Amendment.  *See* 518 U.S. at 323-24 ("We conclude that no jury trial right exists where a defendant is prosecuted for multiple petty offenses.  The Sixth Amendment's guarantee of the right to a jury trial does not extend to petty offenses, and its scope does not change where a defendant faces a potential aggregate prison term in excess of six months for petty offenses charged.").  Accordingly, Defendant's entire basis for seeking to preserve this issue for appeal, and Defendant's basis for arguing for a jury trial here, lacks the very underpinnings purportedly relied on by Defendant in the first place.

Defendant likewise admits that the Ninth Circuit has squarely been presented with, and received briefing on, the issue of whether a federal petty misdemeanor should be subject to the Sixth Amendment jury trial right, and further admits that the Ninth Circuit has squarely rejected relief identical to that which is sought here.  *See United States v. Ehmer*, 87 F.4th 1073, 1107-08 (9th Cir. 2023) ("Appellants contend, as a threshold matter, that the Sixth Amendment requires a jury trial in all criminal cases, including misdemeanors. . . . *Southern Union* makes clear that the *Apprendi* line of cases leaves undisturbed the long-recognized petty-offense exception to the jury-trial right.").

Defendant argues, in the alternative, that the Court should "exercise its discretion" and grant Defendant a jury trial "consistent with the Federal Rules of Criminal Procedure."  [Dkt. 20 at 6].  Assuming without deciding that a Magistrate Judge possesses such discretion, the Court finds that this case does not present circumstances sufficient to justify a discretionary jury trial for a petty offense.  A review of the case law, including the sole case cited by Defendant, makes clear that a jury trial for a petty offense is appropriate only where there are highly unusual or unique

circumstances.  *See United States v. Greenpeace, Inc.*, 314 F. Supp. 2d 1252, 1264 (S.D. Fla. 2004) ("This case is, to put it mildly, unusual, and would benefit from a jury's collective decision-making."); *United States v. Rodriguez*, No. 1:10-CR-120-MHW, 2010 WL 11531202, at *1 (D. Id. Oct. 15, 2010) ("While this is a petty offense case, it is not a run-of-the-mill petty offense assault."); *cf. United States v. Cruscial*, No. 3:18-cr-00465-JR, 2019 WL 1087150, at *7 (D. Ore. Mar. 7, 2019) (declining to exercise discretion to order a jury trial for a petty offense where the case was "fairly standard" and presented no "novel questions" or "untested or stale legal theories").  Defendant does not argue, nor does the Court find, that this case presents unusual or unique circumstances that might warrant a discretionary jury trial.  At the hearing, counsel for the Defendant admitted that inherent in the Court's discretion here is the discretion to decline to hold a jury trial.  The Court therefore exercises its full discretion here and declines to order a discretionary jury trial in this non-novel, unremarkable misdemeanor case.

Accordingly, Defendant's motion for a jury trial [Dkt. 20] is **DENIED**.

## II.    MOTIONS TO SUPPRESS

In two separate motions, Defendant moves to suppress the fruits of allegedly unlawful searches and seizures.  [Dkt. 16; Dkt. 18].  Specifically, Defendant argues that Ranger Pearson unconstitutionally prolonged the initial traffic stop, and then engaged in an unlawful search of the vehicle by ordering Defendant to roll down the rear passenger window.  [Dkt. 18 at 3-6].  Defendant moves to suppress all evidence gathered after the time of those alleged Fourth Amendment violations.  [Dkt. 28 at 3].  Defendant also argues that Ranger Pearson arrested Defendant without probable cause, and that therefore, the evidence obtained after that arrest should be suppressed as well.  [Dkt. 16 at 3-5; Dkt. 29 at 3].  Defendant requests an evidentiary hearing on these issues.  [Dkt. 28 at 4; Dkt. 29 at 4].

### A.    Relevant Legal Standards

#### 1.    The Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV. The "basic purpose of this Amendment" is "to safeguard the privacy and security of individuals

against arbitrary invasions by governmental officials." *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (quoting *Camara v. Municipal Ct. of City & Cnty. of S.F.*, 387 U.S. 523, 528 (1967)).

"[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Lange v. California*, 594 U.S. 295, 301 (2021) (citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). The reasonableness of a particular search or seizure depends upon whether, objectively, the challenged action was justified under the totality of the circumstances. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735-36 (2011); *Samson v. California*, 547 U.S. 843, 848 (2006).

Warrantless searches and seizures violate the Fourth Amendment unless they fall within one of a "few specifically established and well-delineated exceptions." *City of L.A., Calif. v. Patel*, 576 U.S. 409, 419 (2015) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "Because warrantless searches and seizures are *per se* unreasonable, the government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement." *United States v. Steinman*, 130 F.4th 693, 711 (9th Cir. 2025) (quoting *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012)).

Under the exclusionary rule, a criminal defendant may move to suppress evidence obtained in violation of the Fourth Amendment. *United States v. Camou*, 773 F.3d 932, 943 (9th Cir. 2014) (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961); *Weeks v. United States*, 232 U.S. 383, 393 (1914)); Fed. R. Crim. P. 41(h). The exclusionary rule covers not just evidence obtained as a direct result of the illegal search or seizure, but also evidence derived from that illegality, the so-called "fruit of the poisonous tree." *United States v. Ngumezi*, 980 F.3d 1285, 1291 (9th Cir. 2020) (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016)).

When deciding a motion to suppress, courts first determine whether a Fourth Amendment violation occurred, and then, whether suppression is appropriate. *Davis v. United States*, 564 U.S. 229, 236-39 (2011); *see also Herring v. United States*, 555 U.S. 135, 140 (2009) ("The fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies.").

### 2.     Evidentiary Hearing

"An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." *United States v. Cook*, 808 F.3d 1195, 1201 (9th Cir. 2015) (quoting *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000)).  "A hearing will not be held on a defendant's pre-trial motion to suppress merely because a defendant wants one. Rather, the defendant must demonstrate that a 'significant disputed factual issue' exists such that a hearing is required." *Howell*, 231 F.3d at 621 (quoting *United States v. Harris*, 914 F.2d 921, 933 (7th Cir. 1990)).  Whether an evidentiary hearing is appropriate lies within the sound discretion of the district court.  *Cook*, 808 F.3d at 1201 (citing *United States v. Quoc Viet Hoang*, 486 F.3d 1156, 1163 (9th Cir. 2007)).

"A hearing is not required on a motion to suppress if the grounds for suppression consist solely of conclusory allegations of illegality." *United States v. Ramirez-Garcia*, 269 F.3d 945, 947 (9th Cir. 2001) (citing *United States v. Wilson*, 7 F.3d 828, 834 (9th Cir. 1993)); *United States v. Cerna*, No. CR 08-0730 WHA, 2010 WL 5387694, at *1 (N.D. Cal. Dec. 22, 2010) ("Fishing expeditions, based on nothing more than a hope that something may turn up once the witnesses testify are not enough to warrant an evidentiary hearing.").

**B.     Ranger Pearson Had Reasonable Suspicion for the Initial Traffic Stop**

Stopping an automobile and detaining its occupants constitutes a "seizure" within the meaning of the Fourth Amendment.  *Brendlin v. California*, 551 U.S. 249, 255 (2007); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)) ("The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest.").  "Under the Fourth Amendment, a seizure for a traffic stop is 'a relatively brief encounter,' 'more analogous to a so-called *Terry* stop than to a formal arrest." *United States v. Taylor*, 60 F.4th 1233, 1239 (9th Cir. 2023) (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)).  An officer may conduct an investigatory stop of a vehicle when "the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *United States*

1  *v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (quoting *Arvizu*, 534 U.S. at 273).

2      "Reasonable suspicion is formed by 'specific, articulable facts which, together with

3  objective and reasonable inferences, form the basis for suspecting that the particular person

4  detained is engaged in criminal activity.'" *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th

5  Cir. 2000) (quoting *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996)).  "An officer is

6  entitled to rely on his training and experience in drawing inferences from the facts he observes, but

7  those inferences must also 'be grounded in objective facts and be capable of rational

8  explanation.'" *Id.* (quoting *Michael R.*, 90 F.3d at 346).  "Although an officer's reliance on a mere

9  'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level

10 required for probable cause, and it falls considerably short of satisfying a preponderance of the

11 evidence standard."  *Arvizu*, 534 U.S. at 274 (citations omitted).

12     Here, there is no genuine dispute that the initial traffic stop was proper.  As detailed above,

13 Ranger Pearson witnessed Defendant driving her car at a high rate of speed; he observed her fail to

14 stop at a stop sign; and he observed her nearly hit a bicyclist in a crosswalk.  Defendant does not

15 dispute that she, at minimum, ran a stop sign.  *See United States v. Choudhry*, 461 F.3d 1097,

16 1100 (9th Cir. 2006) ("A traffic violation alone is sufficient to establish reasonable suspicion.");

17 *see also United States v. Ludwig*, 641 F.3d 1243, 1247 (10th Cir. 2011) ("It's long been the case

18 that an officer's visual estimation can supply probable cause to support a traffic stop for speeding

19 in appropriate circumstances.").

20     Therefore, the Court finds that Ranger Pearson had more than reasonable suspicion to

21 effectuate the initial traffic stop based on his observations that Defendant committed multiple

22 traffic violations.  Accordingly, Ranger Pearson's actions in initiating the traffic stop were

23 objectively reasonable and permissible under the Fourth Amendment.

24 **B.    The Initial Stop Was Not Unreasonably Prolonged**

25     The gist of Defendant's first motion to suppress is that Ranger Pearson impermissibly

26 extended the traffic stop in violation of the Fourth Amendment.  [Dkt. 18 at 3-5].

27     "A seizure for a traffic violation justifies a police investigation of that violation."

28 *Rodriguez*, 575 U.S. at 354.  "To be lawful, a traffic stop must be limited in its scope: an officer

United States District Court
Northern District of California

13

may 'address the traffic violation that warranted the stop,' make 'ordinary inquiries incident to the traffic stop,' and 'attend to related safety concerns.'" *Taylor*, 60 F.4th at 1239 (quoting *Rodriguez*, 575 U.S. at 354-55). "The stop may last 'no longer than is necessary to effectuate' these purposes and complete the traffic 'mission' safely." *Id.* (quoting *Rodriguez*, 575 U.S. at 354-55).

"Lawful inquiries incident to a traffic stop can include checking a driver's license, determining whether there are outstanding warrants, and inspecting the automobile's registration and proof of insurance." *Steinman*, 130 F.4th at 703 (citing *United States v. Ramirez*, 98 F.4th 1141, 1144 (9th Cir. 2024)). "Such routine checks 'ensur[e] that vehicles on the road are operated safely and responsibly." *United States v. Nault*, 41 F.4th 1073, 1078 (9th Cir. 2022) (quoting *Rodriguez*, 575 U.S. at 355).

"Attending to related safety concerns includes 'certain negligibly burdensome precautions in order to complete [the traffic] mission safely.'" *Steinman*, 130 F.4th at 703 (quoting *Rodriguez*, 575 U.S. at 356). "So, for example, an officer may order the driver of a vehicle to exit the vehicle during a traffic stop." *Id.* (quoting *Ramirez*, 98 F.4th at 1144). An officer may also conduct "a criminal history check," or inquire regarding a driver's parole status, or "ask about weapons" because these are all "negligibly burdensome" measures that reasonably relate to officer safety. *Ramirez*, 98 F.4th at 1144-45.

A traffic stop may become unlawful "if it is prolonged beyond the time reasonably required to complete the mission of issuing a 'ticket for the violation.'" *Steinman*, 130 F.4th at 704 (quoting *United States v. Hylton*, 30 F.4th 842, 847 (9th Cir. 2022)). "However, 'the Fourth Amendment tolerate[s] certain unrelated investigations that [do] not lengthen the roadside detention." *Id.* (quoting *Rodriguez*, 575 U.S. at 354). But an officer may not "make unrelated investigation inquiries 'in a way that prolongs the stop'" unless the officer has "reasonable suspicion of an independent offense." *Id.* (quoting *United States v. Landeros*, 913 F.3d 862, 866-67 (9th Cir. 2019)); *see Nault*, 41 F.4th at 1078 ("[U]nrelated inquiries such as dog sniffs or other non-routine checks, which are 'aimed at detecting evidence of ordinary criminal wrongdoing,' lack the same 'close connection to roadway safety,' and must be justified by independent

14

reasonable suspicion.") (internal quotation marks and alteration omitted).

"Accordingly, an officer's inquiries during a traffic stop are permissible if they are '(1) part of the stop's 'mission' or (2) supported by independent reasonable suspicion." *Nault*, 41 F.4th at 1077-78 (quoting *Landeros*, 913 F.3d at 868).

Because, as discussed above, Ranger Pearson had a proper basis for effectuating the initial stop of Defendant's vehicle based on reasonable suspicion, Ranger Pearson's asking Defendant basic questions relating to the mission of the traffic stop was permissible. Accordingly, Ranger Pearson's questions to Defendant regarding why she had "taken off," whether she had identification and registration, and whether she had any weapons in the vehicle were all permissible because these questions were within the scope of the traffic stop's mission.

With regard to the allegedly impermissible extension of the traffic stop, Defendant relies on four specific actions taken by Ranger Pearson: (1) ordering Defendant to roll down the rear passenger window; (2) asking for the rear passenger's identification; (3) "repeatedly questioning" Defendant about what she and her passenger had been doing in the immediate vicinity; and (4) asking Defendant whether there were any drugs in the vehicle. [Dkt. 18 at 4-5].

The Court addresses each of these asserted bases in turn to determine whether the traffic stop was prolonged by the accused actions of Ranger Pearson, and if so, whether any such prolongation was supported by reasonable suspicion of an independent offense "based on the information available at that juncture." *Steinman*, 130 F.4th at 704.

### 1.    Ordering Defendant to Roll Down the Rear Passenger Window

Defendant argues that, by ordering her to roll down the rear passenger window "within about 25 seconds" of approaching her vehicle, Ranger Pearson impermissibly exceeded the scope of the traffic stop's mission, because the officer's request "had nothing to do with writing a ticket or investigating a traffic violation." [Dkt. 18 at 4].The Government argues that the request to roll down the window was justified because: (1) the request facilitated the officer's own safety; (2) it enabled the officer to assess whether it was safe to allow Defendant to continue to drive; and (3) it facilitated communication between the officer and both occupants of the vehicle. [Dkt. 25 at 8].

The Court finds that Ranger Pearson's request for Defendant to roll down the rear window

1    did not exceed the bounds of the traffic stop mission, because it was a negligibly burdensome

2    request that facilitated the officer's safety.  *Steinman*, 130 F.4th at 703; *see Pennsylvania v.*

3    *Mimms*, 434 U.S. 106, 110 (1977) (per curium) ("Establishing a face-to-face confrontation

4    diminishes the possibility, otherwise substantial, that the driver can make unobserved movements;

5    this, in turn, reduces the likelihood that the officer will be the victim of an assault.").  The

6    bodycam footage shows the male passenger visible through the rear passenger window sitting in

7    the seat closest to Ranger Pearson when Ranger Pearson first approached the vehicle.  At the point

8    in time when Ranger Pearson asked Defendant to lower the rear passenger window, he already had

9    reasonable suspicion to initiate the stop for all of the reasons discussed.  Under applicable legal

10    standards, the request to lower the rear passenger window was a permissible safety precaution

11    which imposed negligible burdens on Defendant.

12        Courts which have been faced with this issue have held that asking for a passenger's

13    window to be rolled down during a traffic stop is permissible and within the scope of the stop's

14    mission based on the public interest in officer safety.  *See, e.g.*, *United States v. Juarez-Sanchez*,

15    No. RDB-21-0174, 2022 WL 1226990, at *1-2 (D. Md. Apr. 26, 2022) (finding no Fourth

16    Amendment violation where the officer effecting the traffic stop "testified that the occupants of

17    the car had only slightly rolled down the passenger side window and that he needed to ask them to

18    roll it down further to conduct the stop"); *see also United States v. Stuckey*, 2023 WL 3931832, at

19    *3 (E.D. Cal. June 9, 2023) ("Officers routinely ask drivers to roll their windows down during

20    traffic stops to facilitate communication between the officers and the driver or to minimize the

21    threat to officer safety inherent in all traffic stops.").

22        Furthermore, the lowering of the passenger rear window was minimally intrusive here.

23    The Supreme Court has held that an officer may permissibly order passengers to exit a vehicle

24    during a traffic stop.  *Michigan v. Long*, 463 U.S. 1032 (1983).  The Ninth Circuit has likewise

25    held that an officer may control the movement of passengers during a traffic stop, either ordering

26    the passenger to exit or ordering them to get back into the vehicle.  *Ruvalcaba v. City of L.A.*, 64

27    F.3d 1323, 1327 (9th Cir. 1995) (ordering passenger to exit vehicle during traffic stop permissible

28    for officer safety); *United States v. Williams*, 419 F.3d 1029, 1033 (9th Cir. 2005) (finding no

United States District Court
Northern District of California

16

United States District Court
Northern District of California

1    Fourth Amendment violation where the officer ordered the passenger to get back in the car during

2    otherwise lawful traffic stop).  In *Ruvalcaba*, the Ninth Circuit reasoned that this "minimal"

3    intrusion into a passenger's liberty is justified in light of the governmental interest in officer

4    safety.  64 F.3d at 1327 (The "danger [to a police officer] is equally grave when a police officer

5    confronts passengers; indeed, it may be more dangerous to have the driver outside the vehicle

6    while one or more other passengers are left inside.  One or more passengers may be seated in the

7    back seat of a car, or the back of a sport utility vehicle, making it difficult, if not impossible, for

8    the officer to keep a close watch on these passengers.").  In particular, the Ninth Circuit noted that

9    "[t]he passenger is not asked to expose any more of his person than is already exposed by virtue of

10   being in the vehicle during the traffic stop."  *Id.*  If an officer can permissibly order a passenger to

11   exit a vehicle during a traffic stop, then asking for the rear passenger compartment window to be

12   lowered is an even less intrusive precaution for officer safety.  And here, just as in *Juarez-*

13   *Sanchez*, asking for the rear passenger window to be lowered exposed nothing more than what

14   would be exposed had Ranger Pearson ordered the passenger to exit the vehicle.

15         Finally, Defendant contends that the proffered officer safety justification is

16   "disingenuous."  [Dkt. 28 at 2].  However, it is well-settled that an officer's "subjective

17   motivations are irrelevant because 'the Fourth Amendment's concern with 'reasonableness' allows

18   certain actions to be taken in certain circumstances, *whatever* the subjective intent."  *Taylor*, 60

19   F.4th at 1240 (quoting *Whren v. United States*, 517 U.S. 806, 814 (1996)).

20         The Court finds that Ranger Pearson's order to roll down the rear passenger window was

21   also permissible, because it was supported by independent reasonable suspicion.  As detailed

22   above, at the time that Ranger Pearson asked Defendant to roll down the rear window, Ranger

23   Pearson had already observed Defendant commit multiple driving violations, he observed that the

24   car had no registration tags, and he observed what he perceived to be signs of impairment in

25   Defendant's physical appearance and demeanor.  Prior to asking Defendant to roll down the

26   window, Defendant had informed Ranger Pearson that she did not have her car registration or

27   proof of insurance because they were both at home, and that she did not stop immediately when

28   Ranger Pearson activated his siren and flashing lights because she needed to get home.  Per the

incident report, as Ranger Pearson spoke with Defendant, he observed that her eyes appeared watery and that her speech sounded slurred.  [Dkt. 17-1 at 7].  Ranger Pearson reported that he could also smell the odor of intoxicants emanating from inside the vehicle.  *Id.*

At that point, Ranger Pearson had independent reasonable suspicion that Defendant may have been driving while intoxicated.  Ranger Pearson's order to roll down the rear window was justified, because it enabled him to further investigate whether Defendant was intoxicated, and relatedly, whether she or the passenger could safely operate the vehicle.  *See Nault*, 41 F.4th at 1080 ("[A]lthough Officer Chroniger's stop was initially justified by an outstanding warrant connected to the vehicle, having conducted a vehicle stop on this basis, Officer Chroniger's mission continued to justify the additional time required to ensure that Nault was lawfully able to drive away the vehicle.").

Defendant argues that the timing of when Ranger Pearson first started to smell alcohol from inside the vehicle is a material disputed fact, based primarily on when Ranger Pearson *told Defendant* he could smell alcohol.  However, at the hearing, Defendant admitted that the time when Ranger Pearson made this statement on the video is not indicative of the time when he actually started to smell alcohol.  Further, while Defendant makes much of the timing of when Ranger Pearson smelled intoxicants, that is at best merely one factor and, as discussed above, there were multiple other indicia (even without the smell of intoxicants) which provided independent reasonable suspicion sufficient to ask Defendant to roll down the rear passenger window.

### 2.     Request for Passenger's Identification

Defendant next argues that Ranger Pearson exceeded the bounds of the traffic stop's mission by asking for the rear passenger's identification.  [Dkt. 18 at 4].  Defendant contends that an officer "may not order a person to identify themselves without particularized reasonable suspicion that that person has engaged or is about to engage in criminal activity."  *Id.* (citing *Landeros*, 913 F.3d at 868).

As an initial matter, to the extent that Defendant argues that *Landeros* precludes any inquiry into a passenger's identity during a traffic stop absent independent reasonable suspicion that the passenger themselves committed a crime, that argument extends *Landeros* beyond its

1    holding.  *Landeros* broadly held that "[a] demand for a passenger's identification is not part of the

2    mission of a traffic stop," reasoning that "[t]he identity of a passenger . . . will *ordinarily* have no

3    relation to a driver's safe operation of a vehicle."  913 F.3d at 868 (emphasis added).  Thus, the

4    express language of *Landeros* does not create a categorical prohibition against asking for a

5    passenger's identification, contrary to Defendant's arguments.

6            Indeed, as recently noted by Judge Gonzalez Rogers in discussing the scope of the holding

7    in *Landeros*: "There are circumstances where passenger identification is necessary for the safe

8    operation of a vehicle.  For instance, *a passenger may be asked to drive a vehicle if the driver is*

9    *suspected of driving under the influence* or a passenger may be the lawful owner of the vehicle."

10   *United States v. Taylor*, 634 F. Supp. 3d 690, 697 (N.D. Cal. 2022) (emphasis added).

11           As noted above, at the time that Ranger Pearson asked Defendant for the passenger's

12   identification, the officer had already developed reasonable suspicion that Defendant may have

13   been driving while intoxicated.  Defendant denied consuming alcohol.  She also denied that her

14   passenger had consumed alcohol.  The officer smelled alcohol emanating from inside the vehicle.

15   The officer was justified in continuing his investigation into whether Defendant was legally

16   impaired, as well as whether she or the passenger could safely drive the vehicle.  *See Nault*, 41

17   F.4th at 1079 ("As with any traffic stop, Officer Chroniger had a strong interest in ensuring that

18   Nault had the ability to legally operate his vehicle."); *Prouse*, 440 U.S. at 658 ("States have a vital

19   interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that

20   these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle

21   inspection requirements are being observed."); *see also United States v. Diaz-Castaneda*, 494 F.3d

22   1146, 1153 (9th Cir. 2007) ("Here Helzer wanted to learn not only who the passenger was in a

23   stopped vehicle, but also whether Diaz–Castaneda could drive the truck once Diaz was arrested.

24   Helzer was therefore free to ask Diaz–Castaneda for identification without implicating the Fourth

25   Amendment.").

26           Further, *Landeros* explicitly distinguishes between an officer's initial request for a

27   passenger's identification (which it impliedly acknowledges is lawful) with an officer's continued

28   demands for such identification after the passenger refuses to comply.  *See* 913 F.3d at 870

United States District Court
Northern District of California

1    ("Regardless of whether the *first* request for Landeros's identification was lawful, law

2    enforcement's refusal to take 'no' for an answer was not.").  Here, Ranger Pearson asked

3    Defendant for the passenger's identification only once, and Defendant (who was apparently in

4    possession of the passenger's identification) immediately complied with the request.  This

5    interaction did not materially prolong the stop.  *See Rodriguez*, 575 U.S. at 355 ("An officer . . .

6    may conduct certain unrelated checks during an otherwise lawful traffic stop."); *United States v.*

7    *Stokes*, No. 21-10069, 2022 WL 486636, at *2 (9th Cir. Feb. 17, 2022) ("Nor was there anything

8    unconstitutional in requesting identification from the occupants of the vehicle at the outset of the

9    stop.").

10          Accordingly, the Court finds that the officer's request for the passenger's identification did

11   not violate the Fourth Amendment.

12          **3.      Questioning Regarding What Defendant and Her Passenger Had Been Doing**

13          Defendant next argues that Ranger Pearson impermissibly extended the stop when he

14   began "repeatedly questioning" her about what she and her passenger had been doing in the

15   immediate vicinity.  [Dkt. 18 at 4-5].  Defendant argues that Officer's Pearson's "repeated

16   questioning" and "failure to accept" her answers, "which went on for a full minute," exceeded the

17   bounds of the traffic stop mission.  *Id.*

18          The Court finds that the officer's questions did not impermissibly extend the traffic stop

19   because, at the time he asked these questions, he had independent grounds to continue this line of

20   questioning.  As discussed above, at the time that Ranger Pearson asked these questions, he had

21   developed reasonable suspicion that the driver of the vehicle was intoxicated.  The officer had by

22   this time stated to Defendant that he could smell alcohol inside the vehicle.  The bodycam footage

23   shows that the passenger had droopy eyes and appeared lethargic, and that Defendant was slurring

24   some of her words.  By repeating his questions, Ranger Pearson was able to further investigate

25   Defendant's demeanor to determine whether she was in fact impaired, as well as to investigate

26   whether her responses were consistent and truthful.

27          **4.      Questions Regarding Alcohol, Weapons, and Drugs**

28          Defendant's final argument is that Ranger Pearson impermissibly extended the stop when

United States District Court
Northern District of California

20

he asked Defendant if there was any alcohol, weapons, or drugs in the vehicle.  [Dkt. 18 at 4-5].  Specifically, Defendant challenges the officer's inquiry into drugs, arguing that the question had "no connection to officer safety[.]"  *Id.* at 5.

First, it is undisputed that, under Fourth Amendment law,  an officer may inquire into whether there are weapons in a vehicle.  *Ramirez*, 98 F.4th at 1144-45.  Further, at the time that Ranger Pearson made this inquiry, he had developed reasonable suspicion based on multiple indicia that Defendant may have been driving while intoxicated.  As such, his inquiry into drugs and alcohol was within the scope of the stop's mission.  *See United States v. Bisso*, No. 6:17-mj-00009-MJS-1, 2017 WL 5484151, at *8 (E.D. Cal. Nov. 15, 2017) (finding officer's questioning regarding drugs to be a permissible extension of the officer's investigation into whether the defendant was driving while impaired, where the "accumulation of evidence" led the officer to reasonably suspect that the driver "was under the influence of *something*," and justified his inquiry regarding drugs).

Finally, the Ninth Circuit has made clear that an officer's combined inquiry as to whether there are drugs or weapons in the vehicle, to which the driver gives a single answer, does not exceed the bounds of the Fourth Amendment.  *See Taylor*, 60 F.4th at 1239 ("Gariano did fleetingly mention drugs in the same breath that he asked about weapons, but Taylor gave a single answer to the combined question and this did not measurably prolong the stop."); *see also Rodriguez*, 575 U.S. at 355 ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop.").

Accordingly, the Court finds that Ranger Pearson's actions did not impermissibly extend the scope of the initial traffic stop in violation of the Fourth Amendment.  Defendant's motion to suppress based on the allegation that Ranger Pearson impermissibly extended the traffic stop [Dkt. 18 at 3-5] is therefore **DENIED**.

**C.    The Order to Roll Down the Rear Passenger Window Was Not an Unlawful Search**

Defendant argues that Ranger Pearson engaged in an unlawful warrantless search by ordering her to roll down the rear passenger window.  [Dkt. 18 at 5].  Defendant argues that a command to roll down a car window is "analogous" to a command to open the door to one's

home, and on that basis, Defendant argues that "[w]hen the police gain visual access to a room by commanding that the door be opened, they conduct a search—even though they have not physically entered the room." *Id.* (citing *United States v. Winsor*, 846 F.2d 1569, 1573 (9th Cir. 1988)).

A "search" occurs within the meaning of the Fourth Amendment when the government invades a place in which a person has a reasonable expectation of privacy. *Olson v. Cnty. of Grant*, 127 F.4th 1193, 1198 (9th Cir. 2025) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). "One who owns and possesses a car, like one who owns and possesses a house, almost always has a reasonable expectation of privacy in it." *Byrd v. United States*, 584 U.S. 395, 404 (2018). However, relevant to Defendant's arguments here, the expectation of privacy associated with a car "is significantly less than that relating to one's home or office." *South Dakota v. Opperman*, 428 U.S. 364, 367 (1976)). Further, "[t]here is no expectation of privacy . . . shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." *Texas v. Brown*, 460 U.S. 730, 740 (1983).

To the extent that Defendant argues that a command to roll down a car window is a warrantless search akin to "gaining access to a room in a house," that argument is not well-supported by precedent. *See United States v. Smith*, No. 2:19-cr-00213-JAM, 2020 WL 5603668, at *2 (E.D. Cal. Sept. 18, 2020) (rejecting an identical argument regarding the applicability of *Winsor* in the context of vehicles, and holding that "when Detective Tonn ordered Defendant to lower his windows, and Detective Wagoner subsequently used his flashlight and turned his body to better see into the car, they did not conduct a search that was unsupported by probable cause"); *Stuckey*, 2023 WL 3931832, at *4 ("Officer Khan's order to Defendant to roll down his passenger-side window and Officer Stephen's use of a flashlight to look inside the vehicle did not infringe on any reasonable privacy expectation and was not a search."). Because Fourth Amendment precedent treats homes differently from automobiles on public streets, Defendant's analogy to case law regarding opening doors to homes is inapposite.

Here, by asking Defendant to press the button to lower the rear passenger window, Ranger Pearson did not infringe on a reasonable expectation of privacy with regard to what could be seen

1    or heard through that opened rear window.  The bodycam footage shows that Ranger Pearson did

2    not (unlike the officers in *Smith* or *Stuckey*) move his body to better see into the vehicle—he

3    remained the same distance away from the car, he did not lean into the rear passenger area, he did

4    not reach into the interior of the car at any time, and he merely used the opened rear passenger

5    window to speak with the passenger.  Based on the totality of the circumstances, there was no

6    "search" within the meaning of the Fourth Amendment.

7            Further, Defendant's characterization of Ranger Pearson's request for Defendant to lower

8    the rear window as an "order" or "command" is not accurate.  The body cam footage makes clear

9    that Ranger Pearson asked Defendant whether she could lower the rear passenger side window,

10   and she immediately consented without any objection or hesitation.  "An individual may waive his

11   Fourth Amendment rights by giving voluntary and intelligent consent to a warrantless search of

12   his person, property, or premises." *United States v. Torres-Sanchez*, 83 F.3d 1123, 1129 (9th Cir.

13   1996).  Relevant factors for determining the voluntariness of consent to a search include: (1)

14   whether the defendant was in custody; (2) whether the arresting officer had his gun drawn; (3)

15   whether *Miranda* warnings had been given; (4) whether the defendant was told he has a right not

16   to consent; and (5) whether the defendant was told a search warrant could be obtained. *Id.* (citing

17   *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1988)).  "These factors are only

18   guideposts, not a mechanized formula to resolve the voluntariness inquiry." *United States v.*

19   *Rodriguez–Preciado*, 399 F.3d 1118, 1126 (9th Cir. 2005). Whether consent is freely given is

20   based on the totality of the circumstances. *United States v. Cormier*, 220 F.3d 1103, 1112 (9th

21   Cir. 2000).

22           Here, Defendant was not in custody at the time of the request to lower the rear passenger

23   window and Ranger Pearson had not drawn his gun.  While Defendant had not been given

24   *Miranda* warnings and Ranger Pearson did not inform her of her right to refuse consent or that a

25   search warrant could be sought, those factors do not automatically render her consent involuntary.

26   *See Torres-Sanchez*, 83 F.3d at 1130 (finding consent voluntary, despite the fact that no *Miranda*

27   warnings had been given, there had been no admonition to the defendant regarding his right to

28   refuse consent, and the officer never explained that a search warrant could be obtained).  Because

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Defendant was not under arrest at the time Ranger Pearson asked her to roll down the rear

2    window, there was no need for *Miranda* warnings at that point in time.  As the bodycam footage

3    shows, Ranger Pearson did not issue a "command" for Defendant to lower the rear window, he

4    simply asked whether she could do so, and significantly, she immediately consented by saying

5    "yes" and did so without any hesitation.  Ranger Pearson used no firearm or other indicators of

6    force or coercion to obtain Defendant's consent to roll down the window.

7        In the totality of the circumstances, the Court finds that Defendant's consent to roll down

8    the rear window was voluntary.  Accordingly, even assuming that rolling down the window

9    resulted in a search of the vehicle for Fourth Amendment analytical purposes, Defendant

10   consented to that search.

11       Accordingly, Defendant's motion to suppress evidence based on an unlawful search [Dkt.

12   18 at 5-6] is **DENIED**.

13   **D.    Probable Cause Supported Defendant's Arrest**

14       Defendant's second motion to suppress is based on the contention that Ranger Pearson

15   lacked probable cause to arrest Defendant, and thus, the evidence seized following that arrest

16   should be suppressed.  [Dkt. 16].

17       "Under the Fourth Amendment, a warrantless arrest requires probable cause."  *United

18   States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Michigan v. Summers*, 452 U.S. 692,

19   700 (1981)).  "Probable cause justifying a warrantless arrest exists where, 'under the totality of the

20   facts and circumstances known to the arresting officer, a prudent person would have concluded

21   that there was a fair probability that the suspect had committed a crime.'"  *United States v.

22   Hamilton*, 131 F.4th 1087, 1094 (9th Cir. 2025) (quoting *United States v. Struckman*, 603 F.3d

23   731, 739 (9th Cir. 2010)) (alteration omitted).  Probable cause "is not a high bar"—it "requires

24   only the kind of fair probability on which reasonable and prudent people, not legal technicians,

25   act." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (alterations, internal quotation marks, and

26   citations omitted).

27       The Government bears the burden of showing probable cause for a warrantless arrest.

28   *United States v. Valencia*, 24 F.3d 1106, 1108 (9th Cir. 1994).  If the Government fails to meet

1    this burden, evidence seized incident to the unlawful arrest is excludable.  *Washington v. Lambert*,

2    98 F.3d 1181, 1186 (9th Cir. 1996).

3         Here, Defendant argues that the totality of the circumstances at the time of her arrest "did

4    not support probable cause."  [Dkt. 16 at 3].  Defendant argues, first, that her performance on the

5    field sobriety tests did not support probable cause, because she gave Ranger Pearson "several

6    reasons" why she would have difficulty performing the tests before the tests were administered—

7    including her nervousness, her "crooked" feet, and unspecified issues with her legs—which she

8    contends "should have given a reasonable officer reason to doubt the reliability of these tests."  *Id.*

9    at 3-4.  Defendant argues that Ranger Pearson did not properly "account" for her professed

10   limitations when scoring her performance on the field sobriety tests.  *Id.* at 4.  In addition,

11   Defendant argues that her physical appearance and demeanor did not support probable cause,

12   because she was "polite," "cooperative," "coherent," and "physically stable" throughout her

13   interaction with Ranger Pearson.  *Id.* at 3-4.  Defendant disputes Ranger Pearson's incident report

14   that she was slurring her speech or swaying, contending that the body worn camera footage shows

15   otherwise.  *Id.* at 4.  Finally, Defendant argues that her driving behavior did not support probable

16   cause, because she obeyed Ranger Pearson's command to pull over, there is no clear evidence that

17   she was speeding, and the bicyclist that she "nearly struck" was, in fact, improperly traversing the

18   crosswalk at the time of the near collision.  *Id.* at 4-5.

19         The Government, in response, argues that the totality of circumstances at the time of

20   Defendant's arrest "are more than enough" to support a finding of probable cause.  [Dkt. 24 at 7].

21   Specifically, the Government points to the following: (1) Ranger Pearson witnessed Defendant

22   drive at a high speed and run a stop sign; (2) he observed that the vehicle Defendant was driving

23   smelled of alcohol; (2) he observed that Defendant exhibited objective symptoms of intoxication,

24   including slurred speech, watery eyes, and difficulty balancing; (3) Defendant denied that she

25   herself and her passenger denied consuming alcohol, notwithstanding the smell of alcohol inside

26   the vehicle; (4) and Ranger Pearson interpreted the field sobriety tests as revealing thirteen "clues"

27   of possible intoxication.  *Id.* at 6-7.

28         The Court finds the totality of the circumstances at the time of arrest supported probable

United States District Court
Northern District of California

25

cause to believe that Defendant had been driving while impaired. *See United States v. Stanton*, 501 F.3d 1093, 1101 (9th Cir. 2007) (finding totality of circumstances supported probable cause for arrest for driving under the influence, where, in addition to preliminary breathalyzer tests indicating the defendant's BAC was above the legal limit, the arresting officer observed the defendant's "watery and bloodshot eyes, unsteady balance, slow speech, and strong odor of alcohol," and also observed the defendant fail two field sobriety tests); *Bisso*, 2017 WL 5484151, at *8 ("While Defendant offered explanations for her poor performance as, one might suspect, most everyone would, her actual performance was in fact poor and an indication of possible drug or alcohol impairment. This alone gave Ranger McGahey probable cause to arrest Defendant for suspicion of DUI.").

As discussed above, the bodycam footage shows that Defendant had repeated difficulty keep her head still during the Horizontal Gaze Nystagamus field sobriety test—a test which did not implicate Defendant's professed feet or leg conditions. During portions of that first test, Defendant's speech was demonstrably slurred. And, as noted above, before starting the test, Defendant denied having any medical conditions. The bodycam footage shows that Defendant also had difficulty performing the Walk and Turn test—she repeatedly tried to start the test before the instructions were completely communicated, and she failed to follow the officer's instructions to take nine steps, instead taking ten steps. Finally, during the One Leg Stand test, the bodycam footage visibly shows Defendant swaying and swinging her arms away from her body. At one point in the video, Defendant's lifted leg can be seen lowering towards the ground as she appears to be losing balance. And, Defendant had such trouble counting slowly to thirty as directed, that Ranger Pearson ended the test early.

Defendant argues that Ranger Pearson never explicitly identified Defendant as the source of the alcohol smell, despite being in close proximity to her during the field sobriety tests. The fact that he does not so indicate does not defeat probable cause. Ranger Pearson spoke with Defendant in the open air, and as can be seen from the video footage, Defendant was observed drinking from a water bottle prior to exiting her vehicle and chewing gum while speaking with Ranger Pearson during the field sobriety tests.

1     Defendant stresses the fact that she told Ranger Pearson that her feet were "sloppy" or not

2  straight during the field sobriety tests.  As noted, this issue was not implicated during the eye test,

3  and Defendant told Ranger Pearson that she did not have any medical conditions as well.  As

4  detailed above, Defendant not only exhibited swaying of arms, she also had difficulty keeping her

5  head still, following instructions, and counting to thirty.

6     Accordingly, in light of the totality of the circumstances and applicable legal standards,

7  Defendant's arrest was supported by probable cause, and therefore, the searches incident to her

8  arrest did not violate the Fourth Amendment.  For these reasons, Defendant's second motion to

9  suppress based on the asserted lack of probable cause to arrest [Dkt. 16] is **DENIED**.

10  **E.      Request for an Evidentiary Hearing**

11     Considering the totality of the circumstances, the Court finds the Government has met its

12  burden of showing Ranger Pearson had reasonable suspicion for initiating the traffic stop based on

13  his observations that Defendant committed various traffic infractions including, among other

14  things, running a stop sign.  The Court finds that Ranger Pearson's actions thereafter were

15  reasonable in scope and duration because, subsequent to the initial stop, Ranger Pearson observed

16  what he perceived to be signs of intoxication from Defendant's demeanor and he smelled alcohol

17  from inside the vehicle, giving rise to the officer's reasonable suspicion that Defendant was

18  driving under the influence of alcohol.  Based on the totality of circumstances, the Court finds that

19  there are no contested issues of fact that require an evidentiary hearing in this matter.

20     Further, Defendant has produced no evidence supporting her argument that Ranger Pearson

21  smelled alcohol only after Defendant rolled down the rear passenger window, or supporting her

22  argument that she did not have watery eyes and was not slurring her speech.  *See Cook*, 808 F.3d

23  at 1201 (holding trial court did not abuse its discretion in denying a request for an evidentiary

24  hearing on a motion to suppress, where the motion failed to raise a material factual dispute);

25  *Howell*, 231 F.3d at 621 ("Howell submitted a boilerplate motion that relied wholly on the fact

26  that the government has the burden of proof to establish adequate *Miranda* warnings.  Based on

27  Howell's conclusory motion, the magistrate judge did not abuse its discretion in refusing to hold

28  an evidentiary hearing."); *see also Franks*, 438 U.S. at 171 ("To mandate an evidentiary hearing,

United States District Court
Northern District of California

the challenger's attack must be more than conclusory and must be supported by more than a desire to cross-examine."); *United States v. Tuyakbayev*, No. 15-cr-00086-RS, 2017 WL 29337, at *3 (N.D. Cal. Jan. 3, 2017) (denying motion for an evidentiary hearing on a motion to suppress where the defendant "simply claimed he was not speeding and that therefore there was a disputed issue of fact requiring an evidentiary hearing").

Accordingly, Defendant's request for an evidentiary hearing on both motions to suppress is **DENIED WITHOUT PREJUDICE**. *See United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1978) ("[I]t is within the trial court's discretion to determine whether and when to hold an evidentiary hearing."); *United States v. Hernandez-Acuna*, 498 F.3d 942, 945 (9th Cir. 2007) (holding that even though "trials serve a different function from evidentiary hearings," a district court could dispense with an evidentiary hearing on a motion to suppress in light of the defendant's opportunity to cross-examine at trial the only witnesses who would have testified at a suppression hearing before the court). At trial on this matter, Defendant will have a full opportunity to cross examine Ranger Pearson, the only witness Defendant has identified who would have been examined at the requested evidentiary hearing.

## III.   CONCLUSION

For all the reasons discussed herein, **IT IS HEREBY ORDERED THAT**:

1. Defendant's Motion for a Jury Trial [Dkt. 20] is **DENIED**.

2. Defendant's Motion to Suppress Arrest for Lack of Probable Cause [Dkt. 16] is **DENIED**.

3. Defendant's Motion to Suppress Stop for Impermissible Extension and Unconstitutional Search [Dkt. 18] is **DENIED**.

**IT IS SO ORDERED.**

Dated:  April 25, 2025

_____
PETER H. KANG
United States Magistrate Judge

United States District Court
Northern District of California

28